**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**DANIEL W. JAMISON,**

      Plaintiff,

v.                                            Civil Action No. **3:19CV19**

**STACEY A. KINCAID,** *et al.*,

      Defendants.

## MEMORANDUM OPINION

Daniel W. Jamison, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this

42 U.S.C. § 1983 action.[1]  The action proceeds on Jamison's Particularized Complaint

("Complaint," ECF No. 19.)  The matter is before the Court on the Motion for Summary

Judgment filed by Defendants Stacey A Kincaid, Sherriff; Mark W. Sites, Chief Deputy of

Operations; Lishan Kassa, MD; Janet Wurie, NP; 1st Lt. Aughavin, Grievance Coordinator; 2nd

Lt. Messier; Lt. Rejeili; Deputy Abel; Deputy Jones; and Deputy Plazyk.  (ECF No 62.)  Jamison

has responded.  For the reasons set forth below, the Motion for Summary Judgment (ECF No.

62) will be GRANTED IN PART AND DENIED IN PART.[2]

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] The Court employs the pagination assigned by the CM/ECF docketing system.  The Court corrects the capitalization, punctuation, and spelling in the quotations from the parties' submissions.  To the extent Jamison misspelled a defendant's name or incorrectly identified his or her official position, the Court utilizes the correct spelling and title from Defendants' Memorandum in Support of the Motion for Summary Judgment.

## I.  Jamison's Allegations and Claims

"Jamison was held at Fairfax County [Adult Detention Center ("ADC")] . . . while awaiting trial and for a short time after sentencing while awaiting relocation to the Virginia state prison system from Oct[ober] of 2016 [until] March 2018." (Compl. 3.)[3]  Jamison claims to suffer from a number of ailments, including celiac disease, a hernia, headaches, hemorrhoids, bloody stools, and chronic pain.  (*Id.*)  During his incarceration at the ADC, Jamison alleges that he was "made to sleep on the floor for long periods of time" and was "locked into cells with no water or working toilet for long periods of time." (*Id.* at 4.)  Additionally, during his incarceration at ADC, Jamison alleges, *inter alia*, that:  he received "no treatment for [his] celiac [disease];" "no diet that is medically necessary for someone with celiac disease, gluten-free;" and, "no access to specialized care or outside care for the Plaintiff's serious medical needs." (*Id.* at 7.)

By Memorandum Opinion and Order entered on September 9, 2020, the Court dismissed Jamison's claims against a number of defendants[4] and Jamison's demand for injunctive relief. (ECF No. 55, 56.)  The following claims remain before the Court:

---

[3] On September 25, 2017, Jamison was convicted of soliciting to commit a murder in the Circuit Court for the County of Fairfax.  (ECF No. 64–7, at 1.)

[4] The Order dismissed Jamison's claims against Aramark, S. Carlisle, Ericha Rauf, PJ Thompson, and Jonita Conner.  (ECF No. 56.)  It also dismissed his claims against Stacey Kincaid, Mark Sites, 1st Lt. Aughavin, 2nd Lt. Messier, Lt. Rejeili, Deputy Able, Deputy Jones, and Deputy Plazyk in their official capacities.  (ECF No. 56); *see* (ECF No. 55, at 7 n.4.)

| Claim One | Stacey Kincaid, as the Sheriff, was in charge of the ADC. Kincaid violated Jamison's rights under the Eighth[5] and Fourteenth[6] Amendments when:<br>(a) she was deliberately indifferent to the inadequate medical care provided to Jamison (Compl. 8–9);<br>(b) she was deliberately indifferent to the fact that Jamison was forced to sleep on the floor (*id.* at 9–10); and,<br>(c) she was deliberately indifferent to the fact that Jamison was placed in a cell without a toilet (*id.*). |
|---|---|
| Claim Two | Mark W. Sites was the Chief Deputy of Operations ("CDO") at the ADC. Sites violated Jamison's rights under the Eighth and Fourteenth Amendments when:<br>(a) he was deliberately indifferent to the inadequate medical care provided to Jamison (*id.* at 11);<br>(b) he was deliberately indifferent to the fact that Jamison was forced to sleep on the floor (*id.*);<br>(c) he was deliberately indifferent to the fact that Jamison was placed in a cell without a toilet (*id.*); and,<br>(d) he was deliberately indifferent to the fact that Jamison was assaulted by other inmates after Deputy Abel called Jamison a snitch (*id.*). |
| Claim Three | Lt. Rejeili violated Jamison's rights under the Eighth and Fourteenth Amendments when he relied upon "the word of the medical department" that Jamison's problems with his medical care were resolved (*id.* at 12), and otherwise failed to ensure that Jamison received appropriate medical care (*id.*). |
| Claim Four | Lt. Messier was in charge of the kitchen when Jamison was incarcerated in the ADC. (*Id.* at 14.) Messier violated Jamison's rights under the Eighth and Fourteenth Amendments when:<br>(a) he "was deliberately indifferent to Jamison's medical need of a medical diet" (*id.*); and,<br>(b) he was deliberately indifferent to the fact that the barber was not "conducting herself in a hygienic and professional manner" (*id.* at 15). |
| Claim Five | Deputy Abel violated Jamison's rights under the Eighth and Fourteenth Amendment when he told inmate Canavan that Jamison snitched on him for stealing supplies from the class room closet. (*Id.* at 15.) |

---

[5] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[6] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

Claim Six      Deputy Jones violated Jamison's rights under the Eighth and Fourteenth
               Amendment when he "gave paperwork to inmate Cherney" that
               indicated Jamison was a snitch. (*id.* at 16.)

Claim Seven    Nurse Practitioner ("NP") Wurie violated Jamison's rights under the
               Eighth and Fourteenth Amendments when she acted with deliberate
               indifference to his serious medical needs.  Specifically,
               (a) she failed to provided treatment for his hernia (*id.* at 17);
               (b) Jamison informed her of his "dietary issues of no bean, celiac/no
               gluten and no poultry," yet she refused to provide Jamison with
               appropriate orders for his diet (*id.*);
               (c)  she refused to conduct blood tests or obtain Jamison's pre-
               incarceration medical records to confirm that Jamison had celiac disease
               (*id.*); and,
               (d); she refused to send Jamison to an optometrist until he could pay for
               his transportation and his medical copayment.  (*Id.*)

Claim Eight    Lt. Aughaven was the Grievance Coordinator at ADC.  Lt. Aughaven
               violated Jamison rights under the First Amendment[7] by refusing to provide
               a grievance form for many months.  (*Id.* at 18.)

Claim Nine     Dr. Kassa was the Medical Director of the ADC and the doctor to whom
               Jamison was most frequently referred.  Dr. Kassa violated Jamison's rights
               under the Eighth and Fourteenth Amendment when:
               (a)  she failed to obtain Jamison's pre-incarceration medical records (*id.*
               at 19);
               (b)  she failed to refer Jamison to an outside specialist for issues pertaining
               to his scalp, gastrointestinal problems, and pain (*id.*); and,
               (c)  she failed to provide appropriate treatment for Jamison's celiac
               disease and prescribed medications that were incompatible with Jamison's
               celiac disease (*id.*).[8]

---

[7] "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const.
amend. I.

[8] Jamison also asserted that Dr. Kassa's actions described amounted to "gross
negligence." (Compl. 20.)  However, in response to Defendants' Motion for Summary
Judgment, Jamison insists that he is not pursuing a medical malpractice or negligence claim, but
only claims of deliberate indifference against Dr. Kassa and Nurse Wurie.  (ECF No. 76, at 21
("[C]ounsel spends several pages arguing medical malpractice and the claims should be
summarily dismissed . . . .  Jamison does not argue medical malpractice.  Jamison states that
Wurie and Kassa were deliberately indifferent to Jamison's serious medical conditions." (citation
omitted).))  Accordingly, the Court declines to treat Jamison's occasional descriptive use of the
word negligence as an attempt to bring negligence or medical malpractice claims against Dr.
Kassa or any other Defendant.  *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir.
1985) ("Where the context, as here, makes clear a [*pro* se] litigant's essential grievance, the

Claim Ten     Deputy Plazyk violated Jamison's rights under the Eighth and Fourteenth
              Amendments when he refused "to exchange Jamison's [meal] trays even
              when [he] knew the food was wrong." (*Id.* at 21.)

For the reasons set forth below, the Motion for Summary Judgment will be GRANTED

with respect to Claims One (a) through One (c), Two (a) through Two (d), Three, Four (a)

through Four (b), Five, Six, Seven (a), Eight, and, Nine (a) through Nine (c). The Motion for

Summary Judgment will be DENIED with respect to Claims Seven (b), Seven (c), and Ten. In

their Motion for Summary Judgment, Defendants fail to address Claim Seven (d) or explain why

they prevail on that claim as a matter of law.

## II.  Summary Judgment Standard

Summary judgment must be rendered "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the

Court of the basis for the motion and identifying the parts of the record which demonstrate the

absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

issue, a summary judgment motion may properly be made in reliance solely on the pleadings,

depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation

marks omitted). When the motion is properly supported, the nonmoving party must go beyond

the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

(quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

---

complainant's additional invocation of general legal principles need not detour the district court
from resolving that which the litigant himself has shown to be his real concern.").

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448).

In support of their Motion for Summary Judgment, Defendants have submitted:  the declaration of CDO Mark Sites ("Sites Decl.," ECF No. 64–1); the declaration of NP Janet Wurie ("Wurie Decl.," ECF No. 65–1); the declaration of Stacey Kincaid ("Kincaid Decl.," ECF No. 70–1); the declaration of Lishan Kassa ("Kassa Decl.," ECF No. 65–2); the declaration of C. Abel (ECF No. 70–2); the supplemental declaration of Lishan Kassa ("Kassa II Decl.," 91–1); and a host of medical and other documents that the Court refers to by the CM/ECF designation.[9] Additionally, as required by Local Civil Rule 56(B), Defendants filed a Statement of Material Facts As To Which There Is No Genuine Issue.  (ECF No. 64.)

On January 14, 2021, Jamison responded to the Motion for Summary Judgment by submitting a Memorandum in Opposition and forty-three pages of exhibits.  (ECF No. 76.) Among the exhibits, Jamison includes an affidavit from Darren Hinzman, a former inmate at ADC.  ("Hinzman Aff.," ECF No. 76–1, at 11.)  On March 29, 2021, Jamison submitted two additional Memoranda in Opposition and attached eighty-five pages of exhibits to the March 29, 2021 Memoranda.  (ECF Nos. 100, 101.)

---

[9] The Court omits any secondary citations from the parties' sworn statements.

Jamison attempts to transform his January 14, 2021 Memorandum in Opposition into a sworn statement by appending the following at the conclusion of the Memorandum:

> Affidavit
> I Daniel W. Jamison do hereby swear and affirm that any and all statement[s] are correct and true, under penalty of perjury, to the best of my knowledge and belief.

(ECF No. 76, at 25.)  A similar statement appears at the end of Jamison's Complaint (ECF No. 19, at 26), and the March 29, 2021 Memoranda in Opposition (ECF No. 100, at 24; ECF No. 101, at 27).  As explained below, these statements do not transform any of these Memoranda or the Complaint into admissible evidence.

Jamison's verification—or sworn statement—is substantially similar to the verification that the United States Court of Appeals for the Fourth Circuit analyzed in *Walker v. Tyler County Commission*, 11 F. App'x 270, 274 (4th Cir. 2001).[10]  In *Walker*, the Fourth Circuit did not permit such verification to transform the complaint into an affidavit because the complaint did not indicate which factual allegations were based on the plaintiffs' personal knowledge. *Id.* at 274 (explaining that former Federal Rule of Civil Procedure 56(e) required an affidavit opposing a motion for summary judgment to be based on personal knowledge).  The Fourth Circuit regarded the complaint as resting on "mere pleading allegations." *Id.*  Additionally, this Court repeatedly informed Jamison that:

> [T]he Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury. Rather, any verified allegations must be set forth in a separate document title "Affidavit" or "Sworn Statement," and reflect that the sworn statements of fact are

---

[10] The verification at issue in *Walker* states: "[T]he facts contained within the attached pleading [are] true, except insofar as they are therein stated to be upon information and belief, and insofar as they are therein stated to be upon information and belief, [Plaintiff] believes them to be true." 11 F. App'x at 274. Nevertheless, as is the case here, "[t]he factual allegations in the complaint do not indicate which, if any, are based on personal knowledge." *Id.* As a result, the Court cannot consider Jamison's filings as "the equivalent of an opposing affidavit." *Id.*

made on personal knowledge and the affiant is competent to testify on the matters stated therein. *See* Fed. R. Civ. P. 56(c)(4).

(ECF No. 20, at 2; *see* ECF No. 48, at 2.)

Furthermore, as pointed out by Defendant Kassa, "Plaintiff did not comply with the United States District Court for the Eastern District of Virginia Local Rule No. 56, as he failed to 'include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute.'" (ECF No. 91, at 1 (quoting E.D. Va. Loc. Civ. R. 56(B)); *see* ECF No. 80, at 1.) Such an omission permits the Court to "assume that facts identified by the moving party in its listing of material facts are admitted." E.D. Va. Loc. Civ. R. 56(B).

Moreover, in his Memoranda in Opposition, Jamison often does not provide any helpful citation to the documents he relies upon to oppose summary judgment. Instead, he broadly contends that his "medical records" and "other documentation" demonstrate that summary judgment is not appropriate. During the course of this litigation, Jamison has submitted hundreds and hundreds of pages of records. The Court is neither obliged, nor inclined, to sort through documents in the first instance to ascertain whether there exists a material dispute of fact. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").[11] Nevertheless, considering Jamison's *pro se* status, the

---

[11] To the extent that Jamison seeks to add new claims by a passing reference in his Memoranda in Opposition to the Motion for Summary Judgment and other various submissions, he may not do so. *See Snyder v. United States*, 263 F. App'x 778, 779–80 (11th Cir. 2008) (refusing to consider petitioner's statement in a reply brief as an attempt to amend his § 2255 motion to add a new claim); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 847 F. Supp. 2d 843, 851 n.9 (E.D. Va. 2012); *Equity in Athletics. Inc. v. Dep't of Educ.*, 504 F.

Court will review the exhibits he attached to Memoranda in Opposition in assessing the propriety of summary judgment.  In light of the foregoing principles and submissions, the following facts are presumed true for purposes of the Motion for Summary Judgment.[12]

### III.  Summary of Relevant Facts

Jamison was an inmate at the ADC from November 2, 2016 until March 20, 2018.  (Sites Decl. ¶ 2.)  Jamison had also been detained at the ADC for short periods of time before November 2, 2016.  (*Id.*)  On September 25, 2017, Jamison was found guilty of Soliciting to Commit a Murder in the Circuit Court for the County of Fairfax.  (ECF No. 64–7, at 1.)  On December 15, 2017, he was sentenced to twenty-years of imprisonment in the Virginia Department of Corrections.  (*Id.*)

### A.  General Conditions at the ADC

Jamison's claims stem from his time at the ADC.  "Inmates at the ADC are not required to sleep on the floor.  Inmates are provided mattresses upon which to sleep.  Some cells have upper and lower bunks."  (Site Decl. ¶ 4.)  "All holding cells at the ADC have running water and a toilet."  (Sites Decl. ¶ 5.)

Nevertheless, the ADC contains an "old side."  (Hinzman Aff. ¶ 3.)  The cells on the old side are made for a single person.  (*Id.*)  Due to overcrowding, sometimes two inmates would be required to share a cell, in which case one of the inmates would sleep on the floor with a mattress.  (*Id.*)  The B Floor on the old side of the ADC contained "5 cell dorms with a common

---

Supp. 2d 88, 111 (W.D. Va. 2007) (citations omitted) (explaining that "new legal theories must be added by way of amended pleadings, not by arguments asserted in legal briefs").

[12] The vast majority of the evidentiary facts are set forth in the following section. However, given the volume of medical care provided to Jamison, in some instances, the Court recites additional evidence specific to a particular claim in conjunction with the analysis of that claim.

area, 2 toilets, and 1 shower.  The individual cells had no toilets or running water.  During counts and over night [the inmates were] locked in [their] cells." (*Id.* ¶ 4.)  In order to use the bathroom, inmates had to use to a call button to alert the deputy to unlock the cell door. (*Id.*)

> Inmates at the ADC are
>
> provided access to medical care, mental health care, dental care, and eye care while at the ADC.  Some services are provided at the ADC and some services are provided by medical professionals at outside locations, depending upon the type of care or treatment needed.  For example, radiology procedures are done by medical professionals at outside locations.

(Sites Decl. ¶ 9.)

### B.  Evidence Regarding the Label of "Snitch"

On or about June 20, 2017, Deputy Abel received a request form from Jamison.  (Abel Decl. ¶ 3.)  In that form, Jamison stated that his cell mate, David Canavan, was stealing hand sanitizer from one of the classrooms.  (*Id.*; ECF No. 64–12, at 1.)[13]  Sergeant Putman "was notified of the information and spoke with Mr. Jamison about the contraband and where it was hidden.  Inmate Jamison was then moved to a different cell block for his safety and well-being." (Abel Decl. ¶ 3.)

Deputy Abel "did not identify Jamison as a 'snitch' to any other inmates." (*Id.* ¶ 4.)  Deputy Abel does not provide to other prisoners the names or identities of inmates who provide information to law enforcement personnel.  (*Id.*)  Deputy Abel did not have any other personal interaction with Jamison.  (*Id.* ¶ 5.)

### C.  Sheriff Kincaid and CDO Sites

Neither Sheriff Kincaid nor CDO Sites recall "receiving any letter from . . . Jamison or receiving any request from" Jamison to speak with them.  (Sites Decl. ¶ 3; Kincaid Decl. ¶ 4.)

---

[13] Deputy Abel notes that hand sanitizer can be used for sniffing.  (Abel Decl. ¶ 4.)

Sheriff Kincaid and CDO Sites swear that, "[i]f an inmate does request to speak with [them] directly about a particular issue that is not resolved by subordinates, then a personal meeting is typically arranged." (Sites Decl. ¶ 3; Kincaid Decl. ¶ 4.)  CDO Sites did not have any such personal meeting with Jamison.  (Sites Decl. ¶ 3.)  Sheriff Kincaid "did not have any personal interaction with . . . Jamison." (*Id.* ¶ 5.)

### D. <u>Jamison's General Medical Care at the ADC</u>

Jamison sought and received medical care "many times during his incarceration at the ADC." (Wurie Decl. ¶ 4.)  Jamison "requested medical and dental [care] over 70 times in the approximately 17 months he was at the ADC, which averages about 4 times a month." (*Id.*)

> Mr. Jamison received treatment for various complaints, including but not limited to: cold symptoms; chronic back pain (from prior injury/surgery); ankle pain; skin dermatitis (which pre-existed); hemorrhoids (which pre-existed); a hernia (which Mr. Jamison reported preexisted, but an ultrasound done while he was at the ADC did not show any hernia); and, gastro-intestinal issues (such as reflux and a few occasions of diarrhea).

(*Id.*)

> In her declaration, NP Wurie swears that:

> Jamison's issues were promptly treated within 24 to 48 hours.  He was given medication for cold symptoms upon being seen; he was continued on pain medication for his back pain throughout his time at the ADC; his ankle was x-rayed (which was negative) and medication [was] provided for pain; ointments and medications [were provided] for his skin dermatitis and . . . cultures were done to determine the type of bacteria and tests done to ensure there were no cancerous cells when the dermatitis did not go away after initial treatments; instructions were provided on preventing skin irritation which can result in infection . . . ; ointments were repeatedly given for his mild hemorrhoids; a bland diet and medication was provided for various gastro-intestinal issues including reflux and occasional diarrhea and gas; and an ultrasound was performed for his complaint about pain from a pre-existing hernia . . . .

(*Id.* ¶ 5.)

### E. Jamison Did Not Initially Inform Medical Personnel at the ADC that He Had Celiac Disease and a Gluten Allergy

The nursing staff at the ADC conducts an initial screening when an inmate is first admitted to the ADC. (Kassa Decl. ¶ 6.) "On the initial health screening done on November 2, 2016, Mr. Jamison was asked if he was presently on any diet ordered by a doctor, and his answer was 'no,' and when asked about allergies, his response was that he was allergic to strawberries and penicillin." (*Id.*)[14]

Also, "[o]n November 2, 2016, [Jamison] completed an authorization for release of medical records for Dr. Weaver of Reston, Dr. Zeller of Winchester, and Berkeley Family Medicine." (Kassa II Decl. ¶ 19.) Jamison, however failed to check the boxes indicating which types of records these providers could disclose. (*Id.*) On November 9, 2016, Jamison corrected this omission with respect to Dr. Zeller, but not the other two providers. (*Id.*)

Before seeing Jamison for the first time, both NP Wurie and Dr. Kassa reviewed Jamison's health screening, which did not indicate that he had celiac disease or needed a gluten-free diet. (Kassa Decl. ¶ 6; Wurie Decl. ¶ 6.) Dr. Kassa first saw Jamison on November 15, 2016. (Kassa Decl. ¶ 7.) "During this visit, . . . Mr. Jamison complained about abdominal pain from a prior hernia. He did not advise [Dr. Kassa] of any celiac disease diagnosis and did not advise [her] of any issues with gluten." (*Id.*) During the multiple other times that Dr. Kassa saw Jamison, "including times that he had gastro-intestinal complaints, he did not discuss with [Dr. Kassa] any alleged prior history of celiac disease or that he needed or wanted to avoid gluten,

---

[14] An earlier health screening for Jamison was conducted on August 9, 2016, when Jamison was briefly admitted to the ADC. (Kassa Decl. ¶ 6.) Then, Jamison also reported that he was not on a medically ordered diet and that he was allergic to strawberries. (*Id.*) Jamison also mentioned that he was allergic to poultry. (*Id.*) Neither of these screenings indicated that Jamison had Celiac disease or that he had a gluten allergy. (*Id.*)

until March 2018." (*Id.* ¶ 8.) Dr. Kassa then requested Jamison's permission to obtain his prior

celiac disease diagnosis or have testing that would confirm that Jamison had celiac disease. (*Id.*)

> Jamison did not tell Dr. Kassa that
>
> [he] had been diagnosed with celiac disease until March 2018. He never requested a gluten-free diet from [her] and there is no indication in his record that he requested one from any [ADC] provider. **There is no indication in the record that he ever told any [ADC] provider that documentation of his celiac disease could be found in his records from Berkeley Family Medicine or other primary care providers.** [Jamison] never requested that [Dr. Kassa] or other medical personnel obtain his records from any provider. There were only three pages with notations of celiac disease in his over several hundred-page chart, all made by other providers or nurses. [Dr. Kassa] did not review any of the entries mentioning [Jamison] had celiac disease until this lawsuit was filed.

(Kassa II Decl. ¶ 5 (emphasis added).) The only records Dr. Kassa reviewed that mentioned

Jamison's celiac disease were the records obtained from Berkeley Family Medicine, which were

received at the ADC shortly after Jamison's release from the ADC in March of 2018. (*Id.*)

> Jamison did not mention celiac disease or gluten intolerances when he was prescribed

medications. (*Id.* ¶ 6.) Moreover, the vast majority of drugs contain no gluten or virtually no

gluten. (*Id.*)

> Jamison's symptoms at the ADC included:
>
> diarrhea, vomiting, gas, and abdominal pain all of which could be explained by a multitude of other conditions, many of which are not serious or life threatening and which do not require a gluten-free diet. [Jamison] gave [Dr. Kassa] no reason to believe his symptoms were caused by celiac disease or were the result of him eating gluten. [She] did not review any of [Jamison's] medical requests in which he mentioned celiac disease.

(*Id.* ¶ 7.)

### F. Jamison's Medical Encounters at the ADC Between November 3, 2016 and March 20, 2018

On November 3, 2016, Jamison submitted a medical request wherein he complained of

stomach problems, which Jamison suspected was caused by a hernia. (ECF No. 91–5, at 2.) The

13

next day, on November 4, 2016, Jamison saw a nurse and complained of stomach problems. (*Id.*) Jamison was provided with a prescription for Tylenol and referred to a physician. (*Id.*)

On November 21, 2016, Jamison saw a nurse who renewed his prescription for Tylenol. (*Id.*) On November 22, 2016, Jamison was seen in the medical department and informed the staff that he was only allergic to strawberries, poultry, and penicillin. (*Id.*) Jamison also reported that he previously had back surgery, had broken his ankle, and suffered from chronic pain. (*Id.*)

In December of 2016, Jamison was seen in the medical department on multiple occasions for complaints of foot and abdominal pain. (*Id.* at 3.) Jamison ascribed his abdominal pain to a hernia. (*Id.*) On December 26, 2016, Dr. Kassa saw Jamison for his complaints of foot and abdominal pain. (Kassa II Decl. ¶ 24.) Dr. Kassa noted that Jamison had a history of neuropathy and diet-controlled diabetes. (*Id.*) Dr. Kassa continued Jamison's gabapentin prescription and ordered "an abdominal ultrasound to diagnose his abdominal pain." (*Id.*) During this visit, Jamison did not mention that he had celiac disease or that he needed a gluten-free diet. (*Id.*)

On December 28, 2016, an ultrasound of Jamison's abdomen was performed. (*Id.* ¶ 25.) "The ultrasound revealed no evidence of a hernia." (*Id.*)

On December 29, 2016, Dr. Kassa saw Jamison for complaints of congestion. (*Id.* ¶ 26.) Dr. Kassa noted that Jamison's abdomen was tender. (*Id.*) Dr. Kassa informed Jamison of the results of his ultrasound and continued Jamison's prescription of gabapentin to treat Jamison's neuropathy. (*Id.*) Jamison did not mention that he had any gastrointestinal issues, that he had celiac disease, or that he required a gluten-free diet. (*Id.*)

On January 10, 2017, Jamison submitted a medical request to see Dr. Kassa to discuss his medication and ultrasound results. (*Id.* ¶ 27.) Nursing staff saw Jamison and he informed them that his medication was helping only slightly. (*Id.*) Jamison was referred to a physician. (*Id.*)

One week later, on January 17, 2017, Dr. Kassa met with Jamison to again discuss his ultrasound results. (*Id.* ¶ 28.) During this encounter, Jamison did not mention that he had any gastrointestinal issues, that he had celiac disease, or that he required a gluten-free diet. (*Id.*)

On January 30, 2017, Jamison saw the nurse practitioner because his prescription for Zantac had expired. (ECF No. 91–5, at 4.) The prescription was renewed shortly thereafter. (*Id.* at 5.)

On February 16, 2017, Jamison saw a nurse for complaints of constipation and gas. (*Id.*) Jamison was provided with milk of magnesia. (*Id.*) Jamison did not mention that he had celiac disease. (*Id.*)

On March 2, 2017, a doctor ordered bloodwork for Jamison. (*Id* at 6.) On April 6, 2017, Jamison saw a nurse and complained of stomach bloating when eating. (*Id.* at 7.) Jamison requested a renewal of his simethicone prescription. (*Id.*) Jamison did not mention that he had celiac disease. (*Id.*) On April 25, 2017, Jamison saw a nurse for his complaints regarding a headache. (*Id.*) He was referred to the nurse practitioner. (*Id.*)

On April 26, 2017, Jamison submitted a medical request wherein he complained of an infection following a haircut. (*Id.*) The following day, on April 27, 2017, the nurse provided Jamison with hydrocortisone for his scalp and Tylenol for his headache. (*Id.*) The nurse instructed Jamison to return to the medical department if there was no improvement. (*Id.*)

On May 27, 2017, Jamison was seen by a nurse for his May 26, 2017 request asking about his medications. (*Id.* at 8.)

15

On May 30, 2017—roughly seven months after arriving at the ADC on November 2, 2016—Jamison submitted a medical request in which he stated for the first time that he wanted to see a doctor about "Celiac/allergies." (*Id.* at 8; ECF No. 100–1, at 60.) "On May 31, 2017, nursing staff evaluated [Jamison] and noted that [Jamison] was experiencing increased nerve pain and celiac symptoms and that he wanted to be on a diet. He was referred to a physician." (Kassa II Decl. ¶ 29.)[15]

On June 1, 2017, Dr. Kassa saw Jamison for his complaints of neuropathy. (*Id.* ¶ 30.) While Dr. Kassa "was aware that Jamison had some concerns with his diet," Dr. Kassa had not been aware that Jamison had complained of celiac disease or requested a gluten-free diet. (*Id.*) Dr. Kassa noted that Jamison had pre-existing orders for a non-dairy diet. (*Id.*) Dr. Kassa referred Jamison "to a nurse practitioner because nurse practitioners typically handle non-complicated dietary concerns, and they would be the providers following him for his non-dairy diet." (*Id.*) The next day, on June 2, 2017, Jamison

> was seen in medical by a nurse practitioner for [his] request for a bland diet. It is noted [that Jamison] reported a history of celiac disease. It was noted that [Jamison] provided medical with inconsistent medical history and he was educated on the importance of an accurate medical history report. The provider granted [Jamison's] request for a bland diet.

(*Id.* ¶ 31.)[16]

On June 12, 2017, Jamison submitted a medical request complaining that the hydrocortisone cream was ineffective for treating the infection to this scalp. (ECF No. 91–5, at

---

[15] Dr. Kassa swears that she did not see this request until after the present lawsuit was filed. (Kassa II Decl. ¶ 29.)

[16] Dr. Kassa swears that she did not review this entry in Jamison's medical record until after this lawsuit was filed. (Kassa II Decl. ¶ 31.)

9.) The next day, on June 13, 2017, Jamison was seen by a nurse for this complaint and again referred to a doctor. (*Id.*)

On June 19, 2017, Dr. Kassa saw Jamison "for complaints of itchy, painful bumps on his face. [Dr. Kassa] diagnosed him with impetigo and prescribed him erythromycin, noting that he should follow up in one week. [Jamison] did not mention celiac disease, GI issues, or a gluten- free diet." (Kassa II Decl. ¶ 32.) Two days later, Dr. Kassa saw Jamison "to address his lesions. [Jamison] reported the lesions had resolved and that the antibiotics had cleared them. [Dr. Kassa] directed [Jamison] to complete the prescribed course of antibiotics. [Jamison] did not mention celiac disease, GI issues, or a gluten-free diet." (*Id.* ¶ 33.)

On June 25, 2017, Jamison asked to see Dr. Kassa regarding his scalp infection. (ECF No. 91–5, at 9.) After a nurse visit on June 26, 2017, Jamison was referred to a physician. (*Id.*)

"On July 1, 2017, [Jamison] submitted a medical request complaining of a facial bump. [Dr. Kassa] gave a telephone order for prescription[] antibiotics and ibuprofen for swelling of [Jamison's] facial bump." (Kassa II Decl. ¶ 34.)

Between July 2, 2017 and July 8, 2017, Jamison suffered from diarrhea and vomiting and was seen by a nurse on multiple occasions. (ECF No. 91–5, at 10.) On July 6, 2017, Dr. Kassa saw Jamison for his complaints of diarrhea. (Kassa II Decl. ¶ 35.) Jamison stated that he did not have blood in his stool and that he was not experiencing abdominal pain. (*Id.*) At that time, Jamison "had already been admitted to medical for several days for an unrelated condition." (*Id.*) Dr. Kassa "prescribed him loperamide, an antidiarrheal. [Jamison] did not mention celiac disease or a gluten-free diet." (*Id.*) On July 10, 2017, Dr. Kassa saw Jamison in the medical department and Jamison reported that he was "feeling much better." (*Id.* ¶ 36.) Dr. Kassa discharged Jamison from the medical department that same day. (*Id.*)

17

On July 17, 2017, Dr. Kassa saw Jamison for his scalp infection and prescribed Bacitracin ointment. (*Id.* ¶ 37.) On August 2, 2017, Jamison submitted a medical request regarding his scalp infection. (ECF No. 91–5, at 11.) A nurse saw Jamison the next day and provided hydrocortisone and referred Jamison to see a doctor. (*Id.*) On August 4, 2017, Dr. Kassa "ordered lab work to be performed on [Jamison] including a comprehensive metabolic panel and complete blood count. [Dr. Kassa] noted that there should be follow up once [Jamison's] lab results were returned." (Kassa II Decl. ¶ 38.)

On August 9, 2017, Jamison was seen by a nurse for his complaints of back pain. (ECF No. 91–5, at 11.)

On August 23, 2017, Jamison's lab work for his scalp infection "was evaluated showing a moderate growth of staph and light growth of Acinetobacter radioresistens.[17] [Jamison's] results showed susceptibility to all tested antibiotics for the staph infection, however the sensitivity test could not be performed on the Acinetobacter radioresistens, a radiation resistant bacterium." (Kassa II Decl. ¶ 39.) On August 28, 2017, Jamison was seen by a physician and it was noted that his scalp infection was responding to Bactrim. (ECF No. 91–5, at 11.) Jamison was provided with Tylenol for his complaints of leg pain. (*Id.*)

> On September 4, 2017, [Jamison] submitted a medical request to see a physician after he fell in the shower. He complained of back pain. When seen by nursing staff in response, [Jamison] did not present with swelling. He was given Tylenol. [Dr. Kassa] saw [Jamison] in medical that day for his back pain. [Dr. Kassa] ordered [Jamison] to have an extra blanket in the dayroom for thirty days. [Jamison] did not request any pain medication. [Dr. Kassa] discontinued the prior order for a bland diet. [Dr. Kassa] would not have done so unless [Jamison] specifically requested that [Dr. Kassa] discontinue the bland diet. [Dr. Kassa] also

---

[17] Acinetobacter radioresistens is a species of bacteria. *See* Laurent Poirel et al., Acinetobacter Radioresistens *as a Silent Source of Carapenem Resistance for* Acinetobacter *Spp*, 52 Antimicrobial Agents & Chemotherapy 1252, 1252 (2008).

renewed [Jamison's] Bactrim prescription.   [Jamison] did not mention celiac disease, any GI issues, or a gluten-free diet.

(Kassa II Decl. ¶ 40.)

On September 6, 2017, Jamison submitted a medical request for gabapentin and to discuss his diet with a nurse practitioner. (ECF No. 91–5, at 12.) On September 7, 2017, Jamison met with a nurse, requested a bland diet, and it was noted in his medical history that he had celiac disease. (*Id.*) On September 11, 2017, a nurse practitioner ordered Jamison to receive a bland diet. (Kassa II Decl. ¶ 41.)

In the second half of September of 2017 and the beginning of October 2017, Jamison was seen in the medical department for back and leg pain after he fell in the shower.[18] (ECF No. 91–5, at 12–13.)

On October 21, 2017, Jamison was seen by a nurse for complaints of continuing back pain and a scalp infection. (*Id.* at 13.) On October 25, 2017, Jamison was prescribed Bactrim for his scalp infection. (*Id.*) On October 31, 2017, Jamison submitted a medical request concerning stomach problems, but did not mention that he had celiac disease. (*Id.*)

Jamison continued to have stomach problems in November, seeing Dr. Kassa again on November 10, 2017:

> On November 7, 2017, [Jamison] submitted a medical request stating that he had been having problems with his stomach and had been vomiting. He noted his abdomen was "really sore." He also stated he needed to discuss his pain medication. [Jamison] was seen by nursing staff the same day. He was referred to a physician. [Jamison] did not mention celiac disease or a gluten-free diet.
> On November 10, 2017, [Dr. Kassa] saw [Jamison] in medical. [Dr. Kassa] noted [Jamison] had been complaining of back pain. [Jamison] did not request pain medication. [Jamison] reported he had been vomiting three times per day. [Dr. Kassa] ordered [Jamison] to have weekly weight checks for six weeks. [Jamison] stated he does not need them. When questioned about these episodes, [Jamison]

---

[18] During this period, on September 25, 2017, Jamison was convicted in the Circuit Court for Fairfax County, meaning his status changed from a pretrial detainee to a convicted felon. (ECF No. 64–7, at 1.)

> said he was "perfectly fine" and left the exam room without letting [Dr. Kassa] evaluate him. [Dr. Kassa] did not mention celiac disease or a gluten-free diet.

(Kassa II Decl. ¶¶ 42, 43 (paragraph numbers omitted).)

On November 21, 2017, Jamison submitted a medical request form and asked why his ranitidine (Zantac) prescription had been discontinued. (*Id.* ¶ 44; ECF No. 91–5, at 5.) On November 24, 2017, Dr. Kassa renewed Jamison's prescription for ranitidine. (Kassa II Decl. ¶ 46.)

On November 22, 2017, Dr. Kassa saw Jamison for his scalp infection and gabapentin prescription. (*Id.* ¶ 45.) Dr. Kassa continued the gabapentin prescription through the end of March 2018. (*Id.*) Jamison did not mention any GI issues, celiac disease, or the need for a gluten-free diet. (*Id.* ¶ 45.)

On November 25, 2017, Dr. Kassa noted in Jamison's record that he was to avoid poultry and he should follow up with an internal medicine doctor to address his hernia concerns. (*Id.* ¶ 46.)

On December 05, 2017, Jamison was seen in the medical department regarding his scalp infection. (ECF No. 91–5, at 15.) It was noted that lesions were improving and there was no active infection. (*Id.*)

On December 24, 2017, Jamison

> submitted a medical request claiming that his ranitidine prescription was not working and that he was still experiencing diarrhea. He also complained that his back and right leg were still hurting. [Jamison] was seen by nursing staff in response to the request and was referred to a physician. [Jamison] did not mention celiac disease or request a gluten-free diet.

(Kassa II Decl. ¶ 48.) Dr. Kassa noted in Jamison's medical file that Jamison was scheduled to see Dr. Ghali, an internal medicine doctor, on December 29, 2017. (*Id.* ¶ 49.) Dr. Kassa prescribed doxycycline for Jamison. (ECF No. 91–5, at 16.)

On January 2, 2018, Jamison saw a nurse and noted that his scalp infection had returned. (*Id.*) Jamison was referred to see a physician. (*Id.*) On January 5, 2018, a physician saw Jamison for his scalp infection and prescribed Bacitracin. (*Id.*)

"On January 17, 2018, [Jamison] submitted a medical request claiming that he had headaches and back pain. He requested to see a physician." (Kassa II Decl. ¶ 50.) On January 19, 2018, Jamison was seen by a nurse and "[h]e mentioned that his diet was causing him 'stomach acid problems.' It was noted that his diet was not yet adjusted. [Jamison] was referred to a physician for his dietary issues. [Jamison] did not mention celiac disease and there was no mention of a gluten-free diet." (*Id.*)

"On January 20, 2018, [Dr. Kassa] saw [Jamison] in medical for his scalp infection. [Dr. Kassa] prescribed [Jamison] Bactrim and Doxycycline. [Jamison] did not mention celiac disease, dietary or GI issues, or a gluten-free diet." (*Id.* ¶ 51.)

On January 23, 2018, Jamison submitted a medical request for renewal of ranitidine and mentioned that he was having problems with his stomach. (ECF No. 91–5, at 16.) On January 27, 2018, a nurse saw Jamison in conjunction with his complaints about ranitidine. (*Id.*) The nurse requested a renewal of the ranitidine prescription. (*Id.*) Jamison did not complain about abdominal pain or discomfort. (*Id.*) On January 31, 2018, Dr. Kassa renewed Jamison's ranitidine prescription. (*Id.*)

"On February 2, 2018, [Jamison] submitted a medical request regarding his scalp infection. [Jamison] was seen by nursing staff on February 4, 2018, in response, who then referred [Jamison] to a physician." (Kassa II Decl. ¶ 53.) On February 5, 2018, Dr. Kassa saw Jamison for his scalp infection. (*Id.* ¶ 54.) Dr. Kassa "noted there was no discharge. [Dr. Kassa] ordered a drainage culture and sensitivity to determine the source of the infection and

21

instructed a contact precaution. [Jamison] made no mention to [Dr. Kassa] of celiac disease, GI issues, or a gluten-free diet." (*Id.*)

On February 26, 2018, Jamison's culture and sensitivity results were returned reflecting "heavy staph growth" that was "[s]usceptible to all tested antibiotics." (ECF No. 91–5, at 17.) On February 27, 2018, Jamison was seen by a physician and provided a triple antibiotic cream. (*Id.*)

On March 1, 2018, seventeen months after Jamison's admission to the ADC on November 2, 2016, Dr. Kassa learned that Jamison had celiac disease. (*Id.* ¶ 55.) Dr. Kassa

> made a note in [Jamison'] chart to obtain records about his dietary restrictions. [Dr. Kassa] ordered [Jamison's] weight to be checked weekly. It was around this time that [Dr. Kassa] first became aware that [Jamison] claimed he had celiac disease. [Jamison] also submitted a medical request on this date asking about the status of the scalp infection culture and also requesting a medical records release form. [Jamison] did not state why he wanted the medical records release form. He made no mention of celiac disease, GI issues, or a gluten-free diet. [Jamison] was referred to the head of nursing for his medical records release request.

(*Id.*) The next day, Dr. Kassa saw Jamison for his scalp infection. (*Id.* ¶ 56.) Dr. Kassa prescribed Bactrim for the recurrent staph infection in Jamison's scalp. (*Id.*) Jamison did not mention "celiac disease, GI issues, or a gluten-free diet." (*Id.*)

On March 5, 2018, Dr. Kassa noted in Jamison's chart "that he was allergic to penicillin, turkey, and strawberry, and that turkey and strawberry should not be included in his diet." (*Id.* ¶ 57.) On March 7, 2018, Jamison saw the nurse practitioner for his scalp infection. (ECF No. 91–5.) Jamison reported that he had chronic neuropathy, but did not mention celiac disease. (*Id.*)

On March 14, 2018, Jamison submitted a medical request complaining of pain in his gut, diarrhea, and excessive gas. (*Id.*) He did not mention celiac disease. (*Id.*)

On March 15, 2018, Jamison was seen by a physician for his scalp infection. (*Id.*) The Bactrim prescription was not working on the infection. (*Id.*) Jamison refused to discuss his GI issues. (*Id.*)

A March 19, 2018 ultrasound of Jamison's liver showed some fatty infiltration, but no other abnormalities. (*Id.*) On March 20, 2018, Jamison was transferred from the ADC to the Virginia Department of Corrections. (Sites Decl. ¶ 2.)

### G. Jamison's Medical Records from Prior Providers

After his March 2018 transfer, on April 2, 2018, the ADC

received [Jamison's] records from Valley Health Berkeley Family Medicine. The records – from 2013 – noted that [Jamison] had been diagnosed with celiac disease. No other mention of the celiac disease was made. There were no orders or prescriptions for a gluten-free diet. [Jamison] was not prescribe[d] any pain management medications. Only penicillin was listed under [Jamison's] allergies.

(Kassa II Decl. ¶ 59.)

The ADC also received Jamison's medical records from a number of his other prior medical providers, but these records did not mention celiac disease. (*Id.* ¶¶ 60–62.) Specifically,

[ADC] also received [Jamison's] records from Fairfax Family Practice from 2009–2011, although it is unclear when they arrived in [Jamison's] chart. [Jamison's] allergies listed included penicillin and latex. [Jamison's] medications included omeprazole, which can treat gastroesophageal reflux disease, morphine, aspirin, and hydrocodone-acetaminophen. [Jamison's] active problems included a herniated disc and lumbar radiculopathy, but did not include celiac disease. It was noted [Jamison] did not have systemic gastrointestinal symptoms. [Jamison's] celiac disease was not mentioned anywhere in the records and there were no orders or prescriptions for a gluten-free diet.
[ADC] also received [Jamison's] records from the Center for Advanced Orthopedics and Pain Management from 2009, although it is unclear when they arrived in [Jamison's] chart. [Jamison] was treated for his back pain. His allergies included penicillin, latex, and strawberries. His past medical history included arthritis, back pain, and stomach ulcers. His medications included morphine, Percocet, MS Contin, and Nexium. [Jamison's] celiac disease was not mentioned anywhere in the records and there were no orders or prescriptions for a gluten-free diet.

23

[ADC] also received [Jamison's] records from the Fairfax-Falls Church Community Services Board from 2016–2017. [Jamison's] allergies listed only included penicillin. His medical history listed reflux treated by Zantac. He complained of anxiety in part due to abdominal and lower back pain, however [Jamison's] celiac disease or gluten-free diet was not mentioned anywhere in the records.

(*Id.* (internal paragraph numbers omitted).)

## IV. Analysis

Because Jamison's claims pertaining to his medical care predominate in the record, it is appropriate to address those claims first. As a result, the Court turns first to Jamison's allegations concerning the denial of adequate medical care, which he raises in Claims Seven (a), (b), and (c); Claims Nine (b) and (c); and Claim One (a), Claim Two (a) and Claim Three, before addressing Jamison's remaining claims.

### A. Alleged Denial of Adequate Medical Care by Medical Providers

Jamison's claims pertaining to the denial of adequate medical care span the time when he was held in the ADC as a pretrial detainee and as a convicted felon. For the time when he was a "'pretrial detainee and not a convicted prisoner,' the Fourteenth Amendment, and not the Eighth Amendment, governs his claim[s]." *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (quoting *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)). However, in the context of inadequate medical care, to survive a motion for summary judgment under either the Eighth or Fourteenth Amendments, a plaintiff must demonstrate that the defendant acted with deliberate indifference to his or her serious medical needs. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (alteration in original) ("[W]e need not resolve whether Brown was a pretrial detainee or a convicted prisoner because the standard in either case is the same—that is, whether a

24

government official has been 'deliberately indifferent to any [of his] serious medical needs.'"

(quoting *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990))).[19]

To make out an Eighth or Fourteenth Amendment claim, a plaintiff must allege facts that

indicate "(1) that *objectively* the deprivation suffered or harm inflicted was 'sufficiently serious,'

and (2) that *subjectively* the prison officials acted with a 'sufficiently culpable state of mind.'"

*Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294,

298 (1991)) (emphasis added).  A medical need is "serious" if it "has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir.

2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

Under the objective prong, the plaintiff must allege facts that suggest that the deprivation

complained of was extreme and amounted to more than the "routine discomfort" that is "part of

the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*,

989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

"In order to demonstrate such an extreme deprivation, a prisoner must allege 'a serious or

---

[19] The United States Supreme Court has held that for a pretrial detainee to establish an excessive force claim under the Fourteenth Amendment, he or she need not show that the officer was subjectively aware that the use of force was excessive; rather, he or she need only show that the force purposely, knowingly, or recklessly used against him or her was objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). However, *Kingsley* did not address whether this standard applies to other claims by pretrial detainees pursuant to the Fourteenth Amendment, and, to date, the United States Court of Appeals for the Fourth Circuit has not considered this issue. *See Mays*, 992 F.3d at 301–02 n.4 (noting that the Fourth Circuit has yet to address whether *Kingsley* applies to other deliberate indifference claims by pretrial detainees and collecting other circuit court of appeals cases that are split on the issue); *Sams v. Armor Corr. Health Servs., Inc.*, No. 3:19CV639, 2020 WL 5835310, at *19 n.19 (E.D. Va. Sept. 30, 2020) (noting that "absent a Fourth Circuit decision applying *Kingsley* to medical deliberate indifference claims, the Court will continue to apply well-settled Fourth Circuit precedent on this matter.") (Lauck, J.)

significant physical or emotional injury resulting from the challenged conditions.'" *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler*, 989 F.2d at 1381).

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson*, 195 F.3d at 695) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm . . . [and] that the official in question subjectively recognized that his or her actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical

personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, "[i]t may not be seriously contended that any prisoner detained for however short a period is entitled to have all his needed elective medical care performed while in custody." *Kersh v. Bounds*, 501 F.2d 585, 589 (4th Cir. 1974).

### 1. **Hernia**

In Claim Seven (a), Jamison contends that NP Wurie failed to provide him with adequate medical care in conjunction with his hernia. However, the medical staff at the ADC conducted an ultrasound on Jamison, which reflected that Jamison did not have a hernia. No evidence exists that Jamison had a hernia while incarcerated in the ADC. Therefore, Jamison fails to satisfy either the objective or subjective prong for this claim of inadequate medical care. Accordingly, Claim Seven (a) will be DISMISSED.

### 2. **Diet and Celiac Disease**

In Claim Seven (b), Jamison contends that he informed NP Wurie of his "dietary issues of no bean, celiac/no gluten and no poultry," yet she refused to provide Jamison with appropriate orders for his diet. Relatedly, in Claim Seven (c), Jamison contends that NP Wurie refused to conduct blood tests or obtain Jamison's pre-incarceration medical records to confirm that Jamison had celiac disease. (*Id.*) In his initial 2016 health screenings, Jamison failed to indicate that he had celiac disease and could not consume gluten or beans. However, on June 2, 2017, Jamison met with a nurse practitioner, presumably NP Wurie, and informed her that he had celiac disease. Although NP Wurie provided Jamison with a bland diet, she did not take any action with respect to his assertion that he had celiac disease, except to chide him about providing an accurate medical history. NP Wurie fails to address this evidence and explain why

27

such action, or lack of action, on her part does not demonstrate deliberate indifference. *See*
*Jamison v. Clarke*, No. 7:18–CV–00504, 2021 WL 969201, at *10–12 (W.D. Va. Mar. 15, 2021)
(denying defendant's summary judgment where the record supported an inference that medical
provider acted with deliberate indifference to Jamison's celiac disease.)  Accordingly, Nurse
Wurie's Motion for Summary Judgment with respect to Claims Seven (b) and Seven (c) will be
DENIED.[20]

In Claim Nine (a), Jamison contends that Dr. Kassa acted with deliberate indifference
when she failed to obtain Jamison's pre-incarceration medical records.  In Claim Nine (c),
Jamison contends that Dr. Kassa acted with deliberate indifference when she failed to provide
appropriate treatment for Jamison's celiac disease and prescribed medications that were
incompatible with Jamison's celiac disease.  The evidence, however, fails to demonstrate that Dr.
Kassa acted with deliberate indifference.  Dr. Kassa had no inkling that Jamison had celiac
disease until March of 2018.  During the multiple times that Dr. Kassa saw Jamison, "including
times that he had gastro-intestinal complaints, he did not discuss with [Dr. Kassa] any alleged
prior history of celiac disease or that he needed or wanted to avoid gluten, until March 2018."
(Kassa Decl. ¶ 8.)  Dr. Kassa then promptly requested Jamison's permission to obtain his prior
medical records that contained a celiac disease diagnosis or testing that confirmed that he had
celiac disease.  Thereafter, Dr. Kassa received Jamison's records from Valley Health Berkeley
Family Medicine, which confirmed Jamison's celiac disease diagnosis.  In light of this evidence,
the record establishes that Dr. Kassa responded reasonably when she eventually learned that
Jamison might have celiac disease.  Furthermore, the record fails to demonstrate that Dr. Kassa
prescribed medications that were incompatible with celiac disease or that she prescribed any

---

[20] NP Wurie has not sought summary judgment with respect to Claim Seven (d).

medication that posed a substantial risk of serious harm to Jamison's health.  Lastly, Jamison

fails to demonstrate that Dr. Kassa was somehow deliberately indifferent by failing to discern

before March of 2018 that Jamison had celiac disease. *Johnson,* 145 F.3d at 168 ("A missed

diagnosis . . . does not automatically translate into deliberate indifference.").  Accordingly,

Claims Nine (a) and Nine (c) will be DISMISSED.

### 3.  Failure to Refer Jamison to an Outside Specialist

In Claim Nine (b), Jamison contends that Dr. Kassa acted with deliberate indifference by

failing to refer him to an outside specialist to treat his scalp issues, gastrointestinal issues, and his

pain.  Jamison received extensive medical care in conjunction with each of these issues.  Jamison

received regular care for his dermatitis and scalp infection from Dr. Kassa and other medical

providers.  Specifically, as noted in her Supplemental Declaration, Dr. Kassa saw Jamison

> on this issue often and prescribed additional antibiotics when the infection
> resurfaced or did not appear to be controlled well by other antibiotics.  [Jamison's]
> infection was cultured several times to determine the source of the infection which
> was primarily staphylococcus aureus (staph).  Sensitivity tests were ordered to
> determine which antibiotics would work best, and [Jamison's] results showed the
> infection would be susceptible to all tested antibiotics.

(Kassa II Decl. ¶ 11.)  Dr. Kassa concluded that Jamison's scalp "infection did not require

referral to an outside provider because, although recurrent, the infection was controlled with

antibiotics and the source was known."  (*Id.*)  Given this record, Jamison fails to demonstrate

that Dr. Kassa's failure to refer him to a specialist for his scalp infection amounted to deliberate

indifference. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) ("Matters that traditionally

fall within the scope of medical judgment are such decisions as whether to consult a specialist or

undertake additional medical testing." (citing *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir.

1992))).

Next, Jamison contends that Dr. Kassa acted with deliberate indifference by failing to refer him to a specialist for his gastrointestinal issues. Jamison was seen regularly by Dr. Kassa and other providers for his gastrointestinal issues. When Jamison suggested that his abdominal pain was caused by a hernia, he was referred for an ultrasound, which revealed that he did not have a hernia. Additionally, Dr. Kassa prescribed medication to treat Jamison's gastrointestinal complaints including Zantac, Pepto Bismol, and loperamide. The record reflects that the worst of Jamison's gastrointestinal complaints appeared to resolve themselves following his ingestion of these medications. Jamison fails to demonstrate that Dr. Kassa's decision not to refer him to a specialist for his gastrointestinal issues amounted to deliberate indifference.

Finally, Jamison contends that Dr. Kassa acted with deliberate indifference by failing to refer Jamison to a specialist for Jamison's complaints of pain. The record reflects that Jamison informed Dr. Kassa "that he experienced neuropathic pain related to lumbar fusion surgery and experienced pain in his ankles second to fracture." (Kassa II Decl. ¶ 10.) In response, Jamison "was prescribed pain medication almost continuously from November 4, 2016, to his discharge in March of 2018, with only a few brief lapses in prescriptions. When [Jamison] brought the lapsed prescriptions to [Dr. Kassa's] attention, [Dr. Kassa] reordered pain medication." (Id.)[21]

---

[21] Jamison was prescribed the following pain medications for the following dates:

**Acetaminophen 1000 mg, twice daily**: November 4, 2016, through November 17, 2016; November 21, 2016, through November 26, 2016; March 2, 2017, through March 7, 2017; April 28, 2017, through May 12, 2017; June 2, 2017, through July 2, 2017; September 15, 2017, through September 20, 2017; January 20, 2018, through March 15, 2018

**Acetaminophen 500 mg, twice daily**: November 22, 2016, through December 22, 2016; August 28, 2017, through September 4, 2017; September 21, 2017, through November 5, 2017; March 16, 2018, through April 30, 2018

**Acetaminophen 300 mg, STAT**: July 3, 2017, through July 4, 2017

She concludes that the source of Jamison's "chronic pain was already known and did not require referral to an outside provider." (*Id.*)

"It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Id.* So long as medical staff respond reasonably to an inmate's complaints of pain, the inmate's Eighth Amendment rights are not violated. *See Brown*, 240 F.3d at 389–90. Because the reasonableness of any such response usually calls for a medical judgment, "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes*, 95 F.3d at 592; *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (internal quotation marks omitted))). Once again, Jamison fails to demonstrate that Dr. Kassa acted with deliberate indifference by failing to refer him to a specialist to address his complaints of pain. *See Self*, 439

---

**Gabapentin 300 mg, twice daily**: December 28, 2016, through April 27, 2017; May 1, 2017, through August 30, 2017; November 28, 2017, through March 28, 2018

**Ibuprofen 600 mg, twice daily**: December 21, 2016, through December 26, 2016; December 31, 2016, through January 5, 2017; July 2, 2017, through July 9, 2017

**Ibuprofen 400 mg, twice daily**: November 22, 2016, through December 22, 2016

(Kassa II Decl. ¶ 13.)

F.3d at 1232 (citing *Ledoux*, 961 F.2d at 1537).  Accordingly, Claim Nine (b) will be DISMISSED.

### B. <u>Alleged Indifference to the Lack of Adequate Medical Care</u>

In Claim One (a) and Claim Two (a), Jamison contends that Sheriff Kincaid and CDO Sites were deliberately indifferent to the inadequate medical care that was provided to Jamison by their subordinates.  In Claim Three, Jamison contends that Lt. Rejeili violated his rights in November of 2017 when he relied upon "the word of the medical department" that Jamison's problems with his medical care were resolved, (Compl. 12), and otherwise failed to ensure that Jamison received appropriate medical care, (*id.*).

In his Complaint, Jamison alleged that he sent correspondence to Sheriff Kincaid and CDO Sites on February 8, 2018 informing them of the inadequate medical care he was receiving. Both Kincaid and Sites deny any knowledge of receiving such a letter or other correspondence from Jamison.  Jamison has not directed the Court to a copy of the February 8, 2018 letter or any admissible evidence indicating that Kincaid or Sites received that letter or any other correspondence regarding his medical care.

Furthermore, Jamison has not produced any specific evidence regarding the content of his communications with Lt. Rejeili that would alert Lt. Rejeili that he could not rely upon the assurances of medical staff regarding Jamison's medical care.  It is well-established that:

> If a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison.  Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.  Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Iko*, 535 F.3d at 242 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).  Jamison has

not produced any evidence from which a reasonable finder of fact could conclude that Sheriff

Kincaid, CDO Sites, or Lt. Rejeili acted with deliberate indifference to Jamison's medical care.

Accordingly, Claims One (a), Two (a), and Three will be DISMISSED.

### C. Alleged Indifference Regarding the Correct Diet for Jamison

In Claim Four (a), Jamison contends that Lt. Messier, who oversaw the kitchen, "was

deliberately indifferent to Jamison's medical need of a medical diet." (Compl. 14.)  Upon his

initial incarceration in the ADC, Jamison had a Medical Diet Order reflecting that he was allergic

to strawberries and poultry. (ECF No. 64–4, at 1.)  On June 2, 2017, after Jamison requested a

bland diet, he was issued a kitchen order for the same. (Kassa II Decl. ¶ 31.)  On or about

August 15, 2017, Jamison submitted an inmate request wherein he complained that his bland diet

tray was fairly repetitive and asked if he could "get a salad and a des[s]ert cake with [his] tray."

(ECF No. 64–5, at 1.)[22]  Lt. Messier responded that the kitchen would try to change up the foods

and that he would pass Jamison's request along to the kitchen supervisors. (*Id.*)

In his final months at the ADC, Jamison submitted a growing number of complaints and

requests regarding the food provided by the kitchen.  On or about December 13, 2017, Jamison

complained that his prescription of a bland diet was wrong and that he was not receiving as much

food as the other inmates. (ECF No. 76–1, at 34.)  Lt. Messier responded that Jamison needed to

"write medical to get off bland diet" and that his "complaint was passed on to kitchen staff."

(*Id.*)

On or about January 18, 2018, Jamison submitted an inmate request wherein he asked

"why am I not receiving a proper diet?" (*Id.* at 38.)  Jamison also complained that he was

---

[22] Defendants note that a request for a dessert cake is not consistent with an individual who is seeking to avoid gluten.

receiving less food than that on the regular meal trays. (*Id.*)  Lt. Messier notified the kitchen staff of Jamison's complaint. (*Id.*)

On or about January 23, 2018, Lt. Messier received an inmate request from Jamison wherein Jamison wrote:

> Is there a supervisor I may talk to because obviously whoever returns these requests does not properly pass information along and follow up to make sure things are carried out!!  Again for the 5th time! I am tired of receiving the wrong diet tray. The food is making me and has made me sick.  Can I please receive the right diet and can I please receive the proper amounts, equal to (NOT LESS THAN) the regular trays.  This has become a ridiculous matter to a simple problem.  I am tired of being sick and tired of being hungry.

(ECF No. 35–4, at 87.)  In an effort to ascertain the exact nature of Jamison's complaint, Lt. Messier responded, "Please be more specific.  Your diet is bland, no dairy, no chicken." (*Id.*)

On or about February 18, 2018, Jamison submitted an inmate request that stated, in pertinent part:

> Yesterday at supper I received a chicken patty for supper. . . .  This happens all of the time.  Like all of the meat here, I cannot eat because it has chicken in it.  I will say it again, the kitchen has NO supervision!  I constantly have less on my tray because the kitchen ignores my diet.

(ECF No. 76–1, at 31.)  On February 21, 2018, Lt. Messier responded:

> Inmate Jamison,
> Use this request form to help solve the issue.  Show it to the post deputy.

> Post Deputy,
> Please call the kitchen for a new tray for inmate Jamison if any of the following items are on it:  chicken, dairy, or spiced food.   If the kitchen staff refuses, I need a name from the kitchen.

(*Id.*)

On March 3, 2018, Jamison submitted another inmate request form wherein he stated:

> Here we are again.  Today, Saturday 3, Mar. 18, I was given a completely different diet. . . .  Also on the tray was a hard boiled egg.  The deputy sent the tray

back. I got the same thing including an egg. I guess sending trays back does not even work.

(*Id.* at 26.) Lt. Messier responded that: "Your diet does not exclude eggs. Bland, no dairy, no chicken, write medical if you do not want eggs." (*Id.*)

Jamison apparently obtained further clarification from the medical department regarding eggs because on or about March 9, 2018, Jamison submitted another inmate request stating:

> I am writing yet again. The issue with my trays is still the same. Eggs and the patty are still being brought to me. When they are sent back they do not substitute it with anything, only remove the patty or eggs. This happens on top of a tray that is already less than a regular tray. . . . This has gone on for way too long."

(*Id.* at 28.) Lt. Messier acknowledged that "[t]he eggs and meat should have been replaced," and encouraged Jamison to continue to ask "the post deputy for help." (*Id.*)

On March 16, 2018, Jamison submitted an inmate request wherein he asked what the ingredients were in the "Dinner Loaf Patty." (*Id.* at 32.) Jamison stated that he was pretty sure the patty was made of chicken. (*Id.*) Jamison also noted that he continued to receive less food on his tray than on the regular trays. (*Id.*) Lt. Messier responded that the kitchen supervisor informed him that the patties were made of beef. (*Id.*)[23]

The vast majority of Jamison's interactions with Lt. Messier regarding his diet occurred after Jamison had been convicted on September 25, 2017. Therefore, to survive summary judgment, Jamison must demonstrate that he was subjected to cruel and unusual punishment.[24]

---

[23] Jamison submitted a label for the "Precooked Dinner Loaf Patty," which he asserts reflect that the patty is made from mechanically separated chicken. (ECF No. 76–1, at 23.)

[24] Under the objective prong for an Eighth Amendment claim challenging conditions of confinement, the inmate must allege that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson*, 503 U.S. at 9). The resulting harm to the inmate is particularly pertinent in assessing whether the inmate has alleged whether a condition was sufficiently

To the extent that Jamison contends that Lt. Messier was deliberately indifferent to his need for a gluten-free diet because of his celiac disease, Jamison fails to demonstrate that he alerted Lt. Messier to this fact, much less that any medical professional directed that Jamison be provided with a gluten-free diet. Accordingly, Jamison fails to demonstrate that Lt. Messier acted with deliberate indifference to Jamison's need for a gluten-free diet.

Jamison also had dietary orders for a bland diet, a poultry-free diet, and a non-dairy diet. Lt. Messier, however, did not act with indifference to Jamison's dietary restrictions. Instead, when Jamison complained that the food he was served was incompatible with these restrictions, Lt. Messier investigated Jamison's complaints to ensure that Jamison was receiving a proper diet and provided Jamison with a written directive to the jail official on duty to ensure that he or she assisted Jamison in receiving a proper diet. Lt. Messier's reasonable responses to Jamison's complaints foreclose a finding that Lt. Messier acted with deliberate indifference. *See Brown*, 240 F.3d at 389–90. Accordingly, Claim Four (a) will be DISMISSED.

In Claim Ten, Jamison contends that Deputy Plazyk acted with deliberate indifference because he refused "to exchange Jamison's [meal] trays even when [he] knew the food was wrong." (Compl. 21.) In response, Defendants direct the Court to one of Jamison's inmate requests from May of 2017 wherein he acknowledged that Deputy Plazyk "called the kitchen numerous times." (ECF No. 64–8, at 2.) Jamison, however, remained incarcerated in the ADC for roughly ten months after he made this statement. The record reflects that during that time he

---

extreme to constitute an unconstitutional infliction of punishment. *Id.* at 1381. "If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment." *Id.* at 1381. To the extent Jamison suggests that Lt. Messier failed to ensure that Jamison received the same amount of food as other inmates, Jamison fails to demonstrate that he sustained a significant physical or mental injury because of a lack of adequate food.

continued to experience difficulty obtaining a proper meal tray from the kitchen. Defendant Plazyk fails to explain, much less demonstrate, why Jamison's May 2017 statement forecloses Jamison's Eighth and Fourteenth Amendment claims against him. The Motion for Summary Judgment with respect to Claim Ten will be DENIED.

### D. Alleged Indifference to the ADC's Barber's Lack of Hygiene

In Claim Four (b), Jamison contends Lt. Messier was deliberately indifferent to the fact that the barber was not "conducting herself in a hygienic and professional manner." (Compl. 15.) The record reflects that on May 1, 2017, Jamison submitted an inmate request wherein he stated:

> Recently I received a haircut on April 17. I was charged the standard fee of $9.00. As a result of this haircut and due to unsanitary conditions by the barber I got a really bad rash. This resulted in me having to go to sick call ($10.00) to get medication (cream) ($5.00) to get this taken care of. As a result, I was seen 2X for this and charged a total of $25.00 for medical due to the fact this was a direct result of getting a hair[cut]. I feel I should not have been charged the $25.00 for medical (or/and) the fee for the haircut should be refunded to my account. Can you please advise and help me with this matter? $34.00 is not a lot of money, but in here is a lot. Thank you so much for your time on this matter.

(ECF No. 76–1, at 24.) On May 8, 2017, Lt. Messier responded, "Your rash may not have been caused by the barber." (*Id.*)

On August 7, 2017, Jamison submitted another inmate request related to the barber. (*Id.* at 40; ECF No. 64–10, at 1.) In that request, Jamison stated that he had just gotten his haircut again and he again had broken out in a rash. (ECF No. 76–1, at 40.) Jamison asserted the rash was attributable to the fact that the barber is "so unclean." (*Id.*) Jamison asked to be reimbursed $58.00 for the haircuts and medical expenses. (*Id.*) On August 14, 2017, Lt. Messier denied Jamison's request. (*Id.*)

Thereafter, as reflected in above, *supra* Part III.F, Jamison received medical care in conjunction with his scalp infection. On October 26, 2017, Dr. Conner, a physician from outside of the ADC, who was seeing Jamison in conjunction with Jamison's infection and psoriasis, sent an e-mail to Dr. Kassa. (ECF No. 64–10, at 1.) Dr. Conner stated in his e-mail that Jamison claims that "sanitation issues within the barber shop, in the ADC, [are] the cause for his infections." (*Id.*) This e-mail prompted Lt. Messier to investigate Jamison's complaints about sanitation issues in the barber shop. (*Id.*)

Lt. Messier then interviewed Jamison, the barber, and the medical staff at the ADC. (*Id.* at 2–3.) Jamison stated that the barber nicked his eyebrow during his April 17, 2017 haircut and the cut then became infected. (*Id.* at 2.) Jamison told Lt. Messier "that the barber does not clean her equipment." (*Id.*)

The barber informed Lt. Messier that she did not nick Jamison's eyebrow. (*Id.*) The barber then demonstrated to Lt. Messier the procedures she utilizes "for cleaning the equipment after each haircut she performs and uses the disinfectant provided by the Sheriff's Office." (*Id.*) Nurse Yanet informed Lt. Messier that Jamison

> came to the ADC from another jail and that he had an existing problem with psoriasis. She stated that the medical staff treat him daily for his psoriasis condition and that the haircuts could be a factor in his flare ups, according to the doctor. He has had constant battle to control the problem since coming to the ADC on Nov. 2, 2016. She further stated that the doctor believes that the cause could from other issues in the jail such as the soap he uses to wash his head.

(*Id.* at 3.) Nurse Yanet further stated "that Inmate Jamison is the only inmate that she knows of to complain that psoriasis flare ups are caused by haircuts he receives." (*Id.*)

Jamison fails to direct the Court to admissible evidence that reflects the barber was engaging in unsanitary conduct. When Lt. Messier investigated Jamison's allegation that the barber was acting in unsanitary manner, the barber demonstrated to him that she conducted

38

herself in a sanitary manner.  Additionally, the medical department provided further assurance to Lt. Messier that Jamison's scalp issues were attributable to Jamison's preexisting psoriasis, rather than unhygienic practices by the barber.  Jamison fails to demonstrate that the barber at the ADC was engaging in conduct that posed a substantial risk of serious harm to inmates at the ADC, much less that Lt. Messier acted with deliberate indifference.  Accordingly, Claim Four (b) will be DISMISSED.

### E.  Refusal to Provide a Grievance

In Claim Eight, Jamison contends that Lt. Aughaven violated his rights under the First Amendment by refusing to provide Jamison a grievance form for many months.  (Compl. 18.)  It is clear that "inmates have no constitutional entitlement or due process interest in access to a grievance procedure."  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any [grievance] procedure voluntarily established by a state.").  Therefore, the failure to provide Jamison prompt access to a grievance form does not violate the First Amendment.   Accordingly, Claim Eight will be DISMISSED.

### F.  Confinement in a Cell Without a Bed or Toilet

In Claims One (b) and Two (b), Jamison contends that Sheriff Kincaid and CDO Sites were deliberately indifferent to the fact that Jamison had to sleep on the floor of his cell.  Although he did not have a bed, Jamison did have a mattress for sleeping on the floor.  Additionally, when not sleeping, Jamison had access to a day room.  Furthermore, Jamison does not specify for how long he was required to use a mattress to sleep on the floor of his cell.  It must be remembered that, "[c]orrectional officials are not required to provide comfortable jails, even for pretrial detainees."  *Tesch v. Cty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998).

The short-term limitation of various freedoms and privileges "are simply part of the general level of discomfort anyone can expect to experience while in custody." *Id.* Jamison fails to demonstrate that sleeping on the floor on a mattress posed a substantial risk of harm to his person or violated the Eighth or Fourteenth Amendment. *See id.* (concluding that requiring a detainee "to wear the same clothes, or receive beverages only with meals, or sleep on his mattress on the floor for less than two full days [does not] rise[] to the level of severity necessary to state a constitutional violation" (citing *Bell*, 441 U.S. at 534); *Ellis v. Pierce Cty., Ga.*, 415 F. App'x 215, 218 (11th Cir. 2011) (observing that "being required to sleep on a mat is 'not necessarily a constitutional violation'" (quoting *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985))); *Putney v. Likin*, 656 F. App'x 632, 642 (4th Cir. 2016) (Niemeyer, J., concurring in part, dissenting in part, and concurring in the judgment) ("Putney has so far failed to explain how the denial of a mattress was anything more than a discomfort, and the Constitution, of course, does not afford him the right to a "comfortable" prison . . . ."). *But see, Lyons v. Powell*, 838 F.2d 28, 31 (1st Cir. 1988) (concluding that pretrial detainee stated a viable claim where he was required to use a floor mattress for a 27-day period where he was confined to his cell for 22–23 hours per day). Accordingly, Claims One (b) and Two (b) will be DISMISSED.

In Claims One (c) and Two (c), Jamison also contends that Sheriff Kincaid and CDO Sites were deliberately indifferent to the fact that he was placed in a cell without a toilet. The record reflects that the majority of cells at the ADC contain running water and toilets. Nevertheless, the ADC contains an "old side." (Hinzman Aff. ¶ 3.) The B Floor on the old side of the ADC contained "5 cell dorms with a common area, 2 toilets, and 1 shower. The individual cells had no toilets or running water. During counts and overnight [the inmates were] locked in [their] cells." (*Id.* ¶ 4.) In order to use the bathroom when locked in their cells, inmates had to

use to a call button to alert the deputy to unlock the cell door.  (*Id.*)  Jamison has not introduced evidence that reflects that jail officials ignored his requests to use the bathroom during the limited time that he was locked in his cell.

"[C]ase law recognizes long-term deprivations of modern toilet facilities as potential Eighth [and Fourteenth] Amendment violations." *White v. Knight*, 710 F. App'x 260, 261 (7th Cir. 2018); *Bilal v. Geo Care, LLC*, 981 F.3d 903, 916 (11th Cir. 2020) ("In short, we conclude that refusing a single bathroom stop during a 600-mile road trip and requiring a civilly committed person to sit in fecal matter for several hours fits squarely within the definition of 'deprivation of basic sanitary conditions.'").  However, the Constitution does not guarantee unlimited access to a toilet for either convicted prisoners or pretrial detainees. *White*, 710 F. App'x at 262 (rejecting inmate's claim that prison officials violated the Eighth Amendment by restricting toilet access to once every two hours during temporary lockdowns).  Jamison has failed to introduce evidence that demonstrates his limited access to a toilet at night and during counts, while he was detained in the old side of the ADC, was sufficiently serious to amount to a violation of rights under either the Eighth or Fourteenth Amendment.  *See Watson v. Graves*, No. 1:15cv1214, 2017 WL 4533103, at *5 (E.D. Va. Oct. 6, 2017) ("Temporary restrictions on bathroom use, even ones lasting several hours, do not constitute the wanton infliction of pain or exhibit deliberate indifference to a prisoner's health or safety." (quoting *Rouse v. Caruso,* 2011 WL 918327 (E.D. Mich. Feb. 18, 2011))), *aff'd sub nom. Watson v. Wright*, 712 F. App'x 328 (4th Cir. 2018); *Peel v. Turner*, No. 07cv0072, 2007 WL 4571114, at *4 (N.D. Okla. Dec. 27, 2007) (concluding that "[w]aiting to go to the bathroom for half an hour does not" violate the Eighth Amendment).  Accordingly, Claims One (c) and Two (c) will be DISMISSED.

41

### G. "Snitch" Related Claims

In Claim Five, Jamison contends that Deputy Abel violated his rights under the Eighth and Fourteenth Amendments when he told inmate Canavan that Jamison snitched on him for stealing supplies from the classroom closet. (Compl. 15.)  In Claim Six, Jamison contends that Deputy Jones violated his rights under the Eighth and Fourteenth Amendments when he "gave paperwork to inmate Cherney" that indicated Jamison was a snitch. (*Id.* at 16.)  In Claim Two (d), Jamison asserts that CDO Sites was deliberately indifferent to the fact that Jamison was assaulted by other inmates after Deputy Abel called Jamison a snitch. (*Id.* a 11.)  Jamison predicates his claim against CDO Sites on the fact that CDO Sites ignored a February 8, 2018 letter Jamison sent to CDO Sites after the assault. (*Id.*)

Jamison, however, has failed to produce evidence to substantiate his contention that Deputy Jones gave paperwork to inmate Cherney that indicates Jamison was a snitch.  Moreover, the record affirmatively reflects that Deputy Abel did not tell inmate Canavan that Jamison was a snitch.  Rather, after Jamison informed on inmate Canavan, Deputy Abel ensured that Jamison was moved to a different cell block for his safety.  Furthermore, CDO Sites denies receiving any letter from Jamison regarding the assault. (Sites Decl. ¶ 3.)  There is no evidence that Deputy Abel, Deputy Jones, or CDO Sites acted with deliberate indifference to Jamison's safety. *See Welty v. Meletis*, No. 3:16cv659, 2019 WL 1575189, at *4 (E.D. Va. Apr. 11, 2019) (requiring pretrial detainee to demonstrate that jail officials acted with deliberate indifference to the risk that he would be assaulted by his fellow inmates).  Accordingly, Claims Two (d), Five, and Six will be DISMISSED.

## V.  Outstanding Motions

Jamison has moved to hold Defendants and their counsel in contempt of court.  (ECF Nos. 72, 102.)  Jamison contends that the Defendants and their counsel submitted intentionally false statements to the Court.  Although the parties dispute some facts, such as the availability of toilets in all holding cells at the ADC, Jamison fails to demonstrate Defendants committed perjury or that their counsel submitted intentionally false or misleading information to the Court. Accordingly, Jamison's Motions to Hold Defendants and Their Counsel in Contempt of Court (ECF Nos. 72, 102) will be DENIED WITHOUT PREJUDICE.

Defendants have moved to stay discovery pending the resolution of the defense of qualified immunity raised in the Motion for Summary Judgment.  (ECF Nos. 94, 96.)  The defense of qualified immunity "exists to 'give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such *pretrial* matters as discovery.'"  *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (citation omitted).  Thus, a defendant raising a qualified immunity defense is often entitled to a stay of discovery until the defense is resolved. *Lescs v. Martinsburg Police Dep't*, 138 F. App'x 562, 564 (4th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982)); *see DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995) (observing that "where there is a material dispute over what the defendant did . . . it may be that the qualified immunity question cannot be resolved without discovery").[25]  Nevertheless,

---

[25] Federal Rule of Civil Procedure 56(d) provides that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may" deny the motion for summary judgment or issue any other appropriate order. Fed. R. Civ. P. 56(d).  "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56[d] in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988)).  Thus, requests for relief under Rule 56(d) "should be denied . . . 'if the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment.'" *Works v. Colvin*, 519 F. App'x

the Court has now resolved the Motion for Summary Judgment without the necessity of addressing Defendants' defense of qualified immunity. Accordingly, the Motions to Stay Discovery (ECF Nos. 94, 96) will be DENIED AS MOOT. Jamison may now pursue discovery with respect the remaining defendants on the claims remaining before the Court. Jamison's outstanding request for the production of documents (ECF No. 88) will be DENIED WITHOUT PREJUDICE, as it is not specifically tied to the remaining claims.

## VI.  Conclusion

The Motion for Summary Judgment (ECF No. 62) will be GRANTED IN PART and DENIED IN PART. Claims One (a) through One (c), Two (a) through Two (d), Three, Four (a) and Four (b), Five, Six, Seven (a), Eight, and, Nine (a) through Nine (c) will be DISMISSED. Jamison's Motion to Hold Defendants and Their Counsel in Contempt of Court (ECF Nos. 72, 102) will be DENIED. The Motions to Stay Discovery (ECF Nos. 94, 96) will be DENIED AS MOOT. Jamison's outstanding request for the production of documents (ECF No. 88) will be DENIED WITHOUT PREJUDICE. The remaining Defendants will be DIRECTED to FILE an answer to Claims Seven (b), Seven (c), Seven (d), and Ten within fourteen (14) days of the date of entry hereof.

---

176, 182 (4th Cir. 2013) (quoting *Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)). Jamison has not filed a Rule 56(d) affidavit or an equivalent, specific statement reflecting why any discovery he desires could defeat the Defendants' Motion for Summary Judgment.

The remaining portion of this civil action will be TRANSFERRED to the Alexandria Division of the United States District Court for the Eastern District of Virginia. *See* E.D. Va. Loc. Civ. R. 3(B)(4); *see, e.g.*, *Allen v. Ulep*, 1:19cv1477, ECF No. 46 (E.D. Va. Aug. 24, 2021) (transferring case to a different division within the Eastern District of Virginia based on the location of witnesses and events).[26]

An appropriate Order will accompany this Memorandum Opinion.

_____ /s/
M. Hannah Lauck
United States District Judge

Date: 9 - 15 - 21
Richmond, Virginia

---

[26] The events in this action occurred in Fairfax County, which is located in the Alexandria Division. E.D. Va. Local Civ. R. 3(B).